**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Windsor Craft Sales, LLC, and Crosby Yacht
Yard Inc.,

        Plaintiffs,

    v.

VICEM Yat Sanayi ve Ticaret AS, and Vicem
Yachts, Inc.,

        Defendants.

**MEMORANDUM OPINION**
**AND ORDER**
Civil No. 10-297 ADM/JJG

---

Aimee D. Dayhoff, Esq., and Geoffrey P. Jarpe, Esq., Winthrop & Weinstine, PA, Minneapolis, MN, on behalf of Plaintiffs Windsor Craft Sales, LLC, and Crosby Yacht Yard Inc.

Kerry L. Bundy, Esq., Christopher J.L. Diedrich, Esq., Matthew B. Kilby, Esq., Michael F. Cockson, Esq., and Jeffrey P. Justman, Esq., Faegre Baker Daniels LLP, Minneapolis, MN, and R. Thomas Farrar, Esq., and Umberto C. Bonavita, Esq., Robert Allen Law, Miami, FL, on behalf of Defendants VICEM Yat Sanayi ve Ticaret AS and Vicem Yachts, Inc.

---

## I. INTRODUCTION

On February 2, 2012, the undersigned United States District Judge heard oral argument on Plaintiffs Windsor Crafts Sales, LLC ("Windsor Sales") and Crosby Yacht Yard Inc.'s ("Crosby") Motion for Summary Judgment [Docket No. 96]. Defendants VICEM Yat Sanayi ve Ticaret AS ("Vicem") and Vicem Yachts, Inc. ("Vicem US") oppose this Motion. For the reasons set forth below, Plaintiffs' Motion is granted in part and denied in part.

## II. BACKGROUND[1]

Vicem is a Turkish corporation engaged in the manufacture and sale of luxury yachts, and Vicem US is a Vicem subsidiary with its principal place of business in Florida. Am. Compl. [Docket No. 29] ¶¶ 3–4. Windsor Craft Sales, LLC, is a Minnesota distributor of

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

luxury yachts, and Crosby builds, restores, and repairs yachts in Massachusetts.  Id. ¶¶ 1–2.  In

2007, Defendants and Windsor Craft Yachts, LLC ("Windsor Yachts") entered into a

Distribution Agreement[2] granting Windsor Yachts exclusive purchase and distribution rights of

Vicem yachts.  Id. ¶¶ 7, 8;  Cockson Decl. [Docket No. 38] Ex. A ("Vicem Agreement") ¶ 1

("[Vicem] hereby appoints [Windsor Yachts] as the authorized and exclusive distributor for the

promotion and sale of [the Windsor yachts]. . . . [Windsor Yachts] shall have the exclusive

rights worldwide to sell the [Windsor yachts]. . . .").  The Vicem Agreement specified that the

thirty-foot and thirty-six-foot yachts would be built with cold-molded mahogany wood treated

with West System Epoxy.  See Dayhoff Decl. [Docket No. 99] Ex. 12 ("Master Letter

Agreement") at A-2, A-9 (the thirty-foot hull was to be made with "[t]hree layers of hand

selected African Mahogany that is Cold Molded by Old World Craftsmen using the most

advanced West System Epoxy" and the thirty-six-foot hull with "Cold Molded Mahogany

West System Epoxy w/ Awlgrip or Varnish Finish").

The Vicem Agreement warranted that "all Products will be manufactured in the highest

quality and be delivered to Distributor in good commercial condition."  Vicem Agreement ¶ 8.

The Vicem Agreement also represented that the "Products will be free from all material defects

and shall be fit for their intended purpose."  Id.  Pursuant to the Vicem Agreement, Windsor

Yachts was to inspect the first shipment and either accept or reject all or some of those yachts,

and then accept or reject future shipments within thirty days of delivery.  Id. ¶ 8(a–b).  The

Vicem Agreement mandated that it "shall be governed by and construed in accordance with the

---

[2] The Vicem Agreement includes the Distribution Agreement, as well as "the Addendums referred to herein, and the Master Letter Agreement between the parties. . . ."  Cockson Decl. Ex. A ¶ 23.

laws of the State of Minnesota." Id. ¶ 22.  Windsor Yachts purchased 31 yachts from Vicem. Am. Compl. ¶ 14.

In July 2008, Windsor Yachts entered into a Distributor Agreement, Bundy Decl. [Docket No. 106] Ex. 10 ("Windsor Agreement"), with Windsor Sales to make it an authorized Windsor Yachts' distributor. Am. Compl. ¶ 15.  The Windsor Agreement appointed Windsor Sales an "authorized Distributor for the promotion and sale of [Windsor Yachts'] boats." Windsor Agreement § 1.  Under the Windsor Agreement, Windsor Sales purchased twenty-seven yachts from Windsor Yachts. Am. Compl. ¶¶ 17–22.  Windsor Yachts also entered into a dealer agreement with Crosby, who purchased one Vicem yacht. Id. ¶¶ 26–27.  Windsor Yachts filed for bankruptcy in June 2009, see In re Windsor Craft Yachts, L.L.C., No. 09-43555 (Bankr. D. Minn.), and in early 2010 Windsor Sales purchased the four remaining Vicem yachts from the Windsor Yachts' bankruptcy estate. Am. Compl. ¶ 23.

Upon receipt of the first yachts in the summer of 2007, Windsor Yachts noticed some blemishes, stripes, brush marks, and sawdust in the varnish; Vicem assured them that these would "not be a problem on any other Windsor Crafts." Dayhoff 2d. Decl. [Docket No. 100] Ex. 27.  However, yachts continued to arrive with paint and varnish problems. See, e.g., id. Exs. 28–29.  On January 20, 2009, Windsor Sales contacted Vicem to inquire about Hull 18 because its dealer in Seattle was concerned the boat would sink as the "e-glass [was] separating from the wood for some reason on the bottom of the boat." Id. Ex. 49.  Vicem instructed that the boat should not be put in the water. Id. Ex. 26 ("Grame Dep.") 198:16-21.  In February 2009 in response to an inquiry from Windsor Sales about cracks in Hull 22, Vicem's expert stated that the crack was visible because "in these gaps some places were filled with epoxy and

[in] some places the epoxy was not applied." Dayhoff Decl. Ex. 22 ("Unal Dep.") 160:14-17. Windsor Sales conducted an inspection of the yachts and determined by December 2009 that a majority of the thirty-one yachts had cracked hulls.  See, e.g., Dayhoff 2d. Decl. Exs. 45, 52–54.  On January 6, 2010, Windsor Sales provided Vicem with a written revocation of acceptance of the yachts.  Am. Compl. ¶ 44.  On January 13, Defendants refused to accept revocation.  Id. ¶ 45.

Plaintiffs' Complaint was filed on February 1, 2010.  This Court denied Defendants' Motion to Dismiss in its October 13, 2010 Order [Docket No. 53].  Plaintiffs filed this Motion for Summary Judgment on November 8, 2011.

## III.  DISCUSSION

### A.  Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(c)).[3]  On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party, however, may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

---

[3] The summary judgment standard was previously located in Rule 56(c).

4

### B.  Applicable Law

In its October 13, 2010 Order, this Court did not reach the issue of whether Minnesota or Florida law applies to the claims at issue.  Id. at 8 ("At this juncture, the Court need not resolve what state's law applies to the breach of warranty claims.").  Defendants now contend, as in their Motion to Dismiss, that Florida law applies or, in the alternative, that New York, Massachusetts, Georgia, or Michigan law applies.  Id.  Plaintiffs argue that Minnesota law applies.  The conflict of law issue will now be addressed.

In Minnesota, general choice of law agreements govern the choice of substantive law and are given effect.  See Schwan's Sales Enter., Inc. v. SIG Pack, Inc., 476 F.3d 594, 596 (8th Cir. 2007).  Minnesota courts have long been "'committed to the rule' that parties may agree [which law] shall govern their agreement and will interpret and apply [that law] where such an agreement is made."  Milliken & Co. v. Eagle Packaging Co., 295 N.W.2d 377, 380 n.1 (Minn. 1980) (quoting Combined Ins. Co. of Am. v. Bode, 77 N.W.2d 533, 536 (Minn. 1956)).  "[M]atters of procedure and remedies [are] governed by the law of the forum state."  Davis v. Furlong, 328 N.W.2d 150, 153 (Minn. 1983).  The Vicem Agreement between Windsor Yachts and Defendants clearly states that Minnesota law governs.  Vicem Agreement ¶ 22 (stipulating that this agreement "shall be governed by and construed in accordance with the laws of the State of Minnesota").  Minnesota law governs both substantive and procedural issues in this case.

Even under the Jepson choice of law framework, Minnesota law would still be the governing law.  The first consideration under Jepson is whether an actual conflict exists.  Jepson v. General Cas. Co. of Wis., 513 N.W.2d 467, 469 (Minn. 1994).  Florida and

Minnesota law differ on the issue of privity — here, Florida law requires privity to maintain a breach of warranty action while Minnesota law does not.  Compare T.W.M. & S.M. v. Am. Med. Sys., Inc., 886 F.Supp. 842, 844 (N.D. Fla. 1995) ("The law of Florida is that to recover for the breach of a warranty, either express or implied, the plaintiff must be in privity of contract with the defendant.") with Durfee v. Rod Baxter Imports, Inc., 262 N.W.2d 349, 357 (Minn. 1977) (stating that "the absence of privity would not bar" breach of warranty claims). The second consideration in a Jepson choice of law analysis — whether either law may be constitutionally applied — is more problematic.  To determine whether a state's law can be constitutionally applied, "that State must have a significant contact or significant  aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."  Jepson, 513 N.W.2d at 469 (quoting Allstate Ins. Co. v. Hague, 449 U.S. 302, 312–13 (1981)).  However, "[c]ontracting parties can, of course, make their expectations explicit by providing in their contract [] that the law of a particular jurisdiction shall govern questions of contract interpretation . . . ."  Hague, 449 U.S. at 328.  Here, the parties have agreed to be bound by Minnesota law, so applying Florida law (or any of the other states' law) would be fundamentally unfair and arbitrary.  Defendants contracted with a Minnesota party with the intent that the boats would be distributed from Minnesota.  States where the boats are docked, in transit, or subsequently sold lack significant contacts to overrule the parties' choice of Minnesota law at the time of contracting.

Lastly, even if another states' law could be constitutionally applied and the analysis progressed to the five-factor test outlined in Milkovich v. Saari, 203 N.W.2d 408  (Minn. 1973), Minnesota law would prevail as the proper law to apply.  The Milkovich factors are: (1)

predictability of result; (2) maintenance of interstate and international order; (3) simplification

of the judicial task; (4) advancement of the forum's governmental interest; and (5) application

of the better rule of law.  Id. at 412.  In this case, as in Jepson, where the conflict stems from a

contract, predictability of result is important.  When parties enter into a contract, "the legal

system will endeavor to give each side the benefit of their bargain . . . . [which] enhances the

predictability of the parties' contractual arrangements."  Jepson, 513 N.W.2d at 470.  The

predictable result, that contracted by the parties, would be for Minnesota law to govern.  The

remaining four factors do not weight heavily in this case, so even under the five-factor

Milkovich test, Minnesota law is proper.  Therefore, Minnesota law will be applied in this

dispute.

### C.  Breach of Contract

Plaintiffs move for summary judgment on their breach of express and implied

warranty claims.  Plaintiffs contend that privity is not necessary but has been established, that

the express warranties and implied warranties of merchantability and fitness for a particular

purpose exist and are not disclaimed, and the Defendants breached those warranties, resulting

in damage to Windsor Sales.  Each argument will be addressed in turn.

### 1.  Privity

As discussed in the Jepson analysis, Florida law requires privity for a breach of

warranty claim, T.W.M. & S.M., 886 F.Supp. at 844, but Minnesota law does not, Durfee, 262

N.W.2d at 357.  Since Minnesota law applies, privity is not a necessary prerequisite here.

Even if it were required, privity has been established here.  Defendants renew their argument

that Windsor Sales is not in privity with them because Windsor Yachts assigned its rights

without Vicem's permission.  Defs.' Mem. in Opp'n to Summ. J. Mot. [Docket No. 104]

("Defs.' Mem.") 17–19.  However, the discovery conducted after the motion to dismiss has

shown privity between Windsor Sales and Defendants.  Specifically, Windsor Yachts made

Windsor Sales its subcontractor, a delegation contemplated by the Vicem Agreement.

Cockson Decl. Ex. A. Addendum C-1 ("Limited Warranty") ¶¶ 1, 3, 6, 7 (making numerous

mentions of "authorized [Windsor Yachts] dealer[s]").  Furthermore, Defendants indemnified

Windsor Yachts, "its parent and subsidiary companies, and their respective officers, directors,

employees, successors, subcontractors, licensees, assigns, and customers . . . for any and all

claims, losses, costs, [and] damages . . . .", Vicem Agreement ¶ 20, which demonstrates an

understanding that Windsor Yachts would subcontract with entities such as Windsor Sales.

This Court concluded at the motion to dismiss stage that "an adequate legal connection exists

between Windsor Sales and Defendants to establish privity of contract,"  Oct. 13, 2010 Order

at 10, and discovery has buttressed the initial showing of privity of contract.

Plaintiff Crosby has also established that it was an intended third party beneficiary of

the Vicem Agreement, and therefore its claims may proceed.  Third party beneficiary rights in

Minnesota are established when the parties to the contract specifically intended to benefit a

third party at the time of the contract.  <u>Julian Johnson Const. Corp. v. Parranto</u>, 352 N.W.2d

808, 811 (Minn. Ct. App. 1984) (stating that third party beneficiary rights can be established

"by showing that the parties to the contract intended to benefit [the third party] at the time they

entered the contract").  Because the Vicem Agreement specifically contemplated the use of

authorized Windsor Yachts' dealers, and because Crosby was one of those dealers, the Vicem

Agreement created rights and benefits for Crosby.  <u>See</u> Oct. 13, 2010 Order at 10–11.

### 2. **Express Warranty**

In Minnesota, a claim for breach of express warranty requires establishing three elements: (1) the warranty's existence; (2) a breach of the warranty; and (3) a causal link between the breach and the harm.  Peterson v. Bendix Home Sys., Inc., 318 N.W.2d 50, 52–53 (Minn. 1982).  Minnesota law provides —

> (1) Express warranties by the seller are created as follows:
>> (a)    Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>> (b)    Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

Minn. Stat. § 336.2-313(1).  Further, "[i]t is not  necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that the seller have a specific intention to make a warranty, but . . . a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."  Minn. Stat. § 336.2-313(2).

To be actionable, warranties must be more than "mere puffery."  See Royal Bus. Mach., Inc. v. Lorraine Corp., 633 F.2d 34, 41 (7th Cir. 1980) ("No express warranty was created by Royal's affirmation that [its products] were of high quality."); see also Frederickson v. Hackney, 198 N.W. 806, 806–07 (Minn. 1924) (finding no express warranty in "trade talk of the conventional and permissible type," such as "his father was the greatest living dairy bull" and "he would be a wonderful asset and would put [his owner] 'on the map'").  However, an oral sales pitch is materially different than a written, contractual warranty —

Where the parties, after negotiations, have reduced the contract of sale to

9

writing, a statement of the quality of the goods to be sold is to be considered not as a mere matter of description or opinion of the seller, but as the "averment of a material fact, of which he [the seller] has taken to himself the knowledge and the existence of which he warrants."

Saunders v. Cowl, 277 N.W. 12, 14 (Minn. 1938) (quotation omitted).  Written provisions in contracts are "a promise, not an expression of opinion. . . ."  Id.

In this case, the existence of an express warranty is clear.  While the statement that the yachts were to be "of the highest quality" is more difficult to quantify, the guarantees that the yachts would be "delivered to Distributor in good commercial condition," and "free from all material defects and shall be fit for their intended purpose," Vicem Agreement ¶ 18, are affirmations of fact and promises as required by Minn. Stat. § 336.2-313.

The remaining two elements of a breach of express warranty claim – breach and causation –  involve disputed, material facts, and are therefore not proper for summary judgment.   Both parties vigorously contest and provide contradicting evidence on the following issues: (1) the current state of the yachts; (2) the quality and quantity of the epoxy applied to the yachts; and (3) the effects of Plaintiffs' storage, maintenance, and transportation of the yachts.  As to the current state of the yachts, Plaintiffs have shown evidence that as of July 2011, every yacht exhibited varnish or paint defects.  Dayhoff Decl. Exs. 15, 24. Plaintiffs also show that nineteen of the yachts exhibited fractures, twenty-five have elevated moisture readings, and twenty-one have delaminations.  Dayhoff Decl. Ex. 24 at 75–76.   As a result of these defects, Plaintiffs claim the vessels need substantial repairs and can no longer be marketed as new.  Dayhoff 2d. Decl. Exs. 62–63.  Conversely, Defendants aver the boats are not nearly as damaged as Plaintiffs allege and that using a resistance-type meter, rather than a capacitance-type meter as Plaintiffs did, shows normal moisture levels for all but a few,

10

isolated areas.  See Bundy Decl. Ex. 24 at 16–18, 23, 28, 32, 42, 45, 54-55, 60, 64, 66, 69, 72, 74.

Defendants also contest that the two additional brands of epoxy used on the yachts – SP Systems and Interlux – are "essentially equivalent to West System epoxy" and are "regularly used in wood-epoxy boatbuilding and repair."  Bundy Decl. Ex. 23 at 15.   Defendants further contend that the hull of every boat was encapsulated in epoxy.  Bundy Decl. Ex. 43 ("Sponberg Dep.") 142:25-143:15.  Plaintiffs' experts did not cite any material differences between the brands of epoxy, but have shown evidence that gaps were "left between where the keel and the plank meet."  Unal Dep. 159:1-7; see also Dayhoff Decl. Ex. 24.   Moreover, Plaintiffs highlight that Defendants' own expert admitted that "some places were filled with epoxy and some places the epoxy was not applied, resulting in the gaps in some places."  Unal Dep. 160:8-17.

Furthermore, Defendants and Plaintiffs dispute material facts regarding the maintenance, storage, and transportation of the yachts.  Defendants aver that for at least one boat — Hull 18, which was dropped by Plaintiffs — transportation has caused damage to the yachts.  Bundy Decl. Ex. 6 at 177:3-17, 181:10-13.  Additionally, Defendants' experts allege that at least eleven of the yachts were poorly supported for long-term storage or over-the-road transport, Bundy Decl. Ex. 23 at 7, and that improper blocking of the boats likely caused hull cracks, Bundy Decl. Ex. 24 at 76.  Defendants also assert that routine maintenance requires that the varnish on the yachts be repainted on a regular basis, at least once a season — and, since Plaintiffs have not done so, many of the vessels' defects are the direct result of Plaintiffs' improper storage, shrinkwrapping, or maintenance.  Bundy Decl. Exs. 23, 24.  Plaintiffs, on the

11

other hand, contend that Defendants' expert testimony is speculative, unreliable, and

inadmissible.  See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999); and Daubert v.

Merrell Dow Pharm., Inc., 509 U.S. 579, 592–93 (1993).  It is premature to now disqualify

Defendants' expert testimony, given that this argument first surfaced in Plaintiffs' Reply

Memorandum [Docket No. 109] and given the inferences applied to the nonmoving party at the

summary judgment stage.  Ludwig, 54 F.3d at 470.  As a result, a material factual dispute

remains.  Accordingly, although an express warranty has been established, summary judgment

is inappropriate on the questions of the breach of that warranty and the causation of the alleged

damages.

### 3.  Implied Warranty

Minnesota law recognizes an implied warranty of fitness for a particular purpose,

Luther v. Standard Conveyor Co., 89 N.W.2d 179, 183–84 (Minn. 1958) ("[W]here the buyer

fully informs the seller of his particular needs and the seller undertakes to supply an article

suitable for the purpose intended, there is an implied warranty that the article will be fit for that

purpose."), as well as an implied warranty of merchantability, Minn. Stat. § 336.2-314(1)

("Unless excluded . . . a warranty that the goods shall be merchantable is implied in a contract

for their sale if the seller is a merchant with respect to goods of that kind.").  Both of these

implied warranties may be disclaimed, however, if disclaimed conspicuously and in writing.

Minn. Stat. § 336.2-316(2) ("[T]o exclude . . . the implied warranty of merchantability . . . the

language must mention merchantability and in case of a writing must be conspicuous, and to

exclude . . . any implied warranty of fitness the exclusion must be by a writing and

conspicuous.").

Plaintiffs' claims under implied warranty of merchantability and fitness for a particular purpose fail because they have been specifically disclaimed. The Vicem Agreement specifically disclaims these implied warranties. Limited Warranty ¶ 2 ("[A]ll implied warranties (INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE) are excluded and disclaimed from warranty coverage where allowed by law."). Furthermore, in the Windsor Agreement between Windsor Craft and Windsor Sales, these implied warranties were specifically disclaimed. Distributor Agreement 2 at ¶ 11(c) (The express warranty "IS EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING SPECIFICALLY ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE."). Because these disclaimers are written and conspicuous, Plaintiffs' implied warranty claims fail as a matter of law and are dismissed.[4]

### D.  Revocation

Revocation of acceptance, in whole or in part, is proper when a buyer has accepted a "commercial unit whose nonconformity substantially impairs its value to the buyer," so long as that acceptance was based "on the reasonable assumption that its nonconformity would be

---

[4]District courts have the power to grant summary judgment sua sponte when "the party against whom the judgment is entered has had a full and fair opportunity to contest that there are no genuine issues of material fact to be tried and the party granted judgment is entitled to it as a matter of law." Burlington N. R.R. Co. v. Omaha Pub. Power Dist., 888 F.2d 1228, 1231 n.3 (8th Cir. 1989); see also Chrysler Credit Corp. v. Cathey, 977 F.2d 447, 449 (8th Cir. 1992) (affirming a district court's sua sponte grant of summary judgment where the non-moving party's "right to judgment turned on the same issue as [the moving party's] right to judgment . . . ."). Because Minnesota law allows the disclaimer of implied warranties of merchantability and fitness for a particular purpose, and because these implied warranties have in fact been disclaimed, summary judgment is warranted on Plaintiffs' implied warranty claims.

cured and it has not been seasonably cured," or "without discovery of such nonconformity if the acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." Minn. Stat. §§ 336.2-608(1)(a–b). Substantial impairment "necessarily involves factual findings," but when the "basic facts are found, the question of whether they constitute substantial impairment is legal in character." Durfee, 262 N.W.2d at 354; see also, Nutrisoya Foods, Inc. v. Sunrich, LLC, 641 F.3d 282, 288 (8th Cir. 2011). While minor defects not substantially interfering with a product's operation are not grounds for revocation, a product has been determined "substantially impaired" if the defect, though curable, has shaken the faith of the purchaser in that product. See Durfee, 262 N.W.2d at 353–54. The test of "substantial impairment" "ultimately rests on a commonsense perception of substantial impairment, akin to the determination of a material breach under traditional contract law." Id. at 353 (discussing Minn. Stat. § 336.2-608).

Additionally, the revocation of acceptance "must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects," and the revocation is not "effective until the buyer notifies the seller of it." Minn. Stat. § 336.2-608(2). When the buyer has accepted the goods and paid the seller for them, the "buyer must within a reasonable time after the buyer discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Id. § 336.2-607(3)(a). "The burden is on the buyer to establish any breach with respect to the goods accepted." Id. § 336.2-607(4).

### 1.  Substantial Impairment

Plaintiffs argue that the yachts' defects, both in their varnish and paint as well as their structural hull integrity, has substantially impaired the yachts' value to them.  Pls.' Mem. in Supp. of Summ. J. Mot. [Docket No. 101] ("Pls.' Mem.") 26–27.  Specifically, Plaintiffs argue that their complaints about varnish and paint were repeatedly assuaged by Defendants but never fully rectified.  Dayhoff 2d. Decl. Ex. 28.  Additionally, as to the hull integrity and the alleged elevated moisture levels, Plaintiffs contend that the yachts' value has been substantially impaired because even if the defects were curable, they "have absolutely no confidence in the merchantability and safety of these yachts."  Pls.' Mem. 27.  Defendants respond that all paint and varnish issues were addressed at time of delivery by refinishing certain boats.  Defs.' Mem. 38–39; Unal Decl. ¶¶ 3–4.  Defendants also contend that the boats are "easily repairable."  Defs.' Mem. 38.

The record shows that Plaintiffs complained about the varnish and paint on the yachts, Defendants seasonably cured the problem, and that Plaintiffs subsequently accepted the repainted, revarnished boats.  See Bundy Decl. Ex. 7 ("Blake Dep.") 237:11-238:23.  Plaintiffs' reasonable assumption that the visible paint and varnish defects would be cured appears to have been seasonably rectified.  However, a factual dispute remains concerning the epoxy, an undiscovered "nonconformity" which may have been difficult to discover before acceptance.  To the extent that the paint and varnish may have failed because the underlying epoxy was insufficient or nonexistent, a material factual dispute remains precluding summary judgment.

Under a "commonsense perception of substantial impairment," the cracked hulls and the

yachts' overall lack of integrity here rises, or sinks, to the level of substantial impairment. Even if repairable, cracked hulls and un-seaworthy vessels "shake the faith of the purchaser" and are a substantial impairment. Defendants argue, however, that Plaintiffs failed to revoke acceptance before substantially changing the condition of the yachts through improper storage, maintenance, and transportation. See supra Section III(C)(2). Because material facts remain in dispute about the cause of the yachts' substantial impairment, summary judgment on this issue is denied.

### 2. Reasonable Time

Defendants argue that even if the yachts were substantially impaired, Plaintiffs failed to revoke acceptance within a reasonable time after discovering the impairment. Defs.' Mem. 39–41. Defendants aver that since the first hull crack was discovered in January 2009, Plaintiffs' revocation a year later in January 2010 was not within the "reasonable time" required by Minn. Stat. § 336.2-608(2). Plaintiffs respond that the hull cracks were latent defects, that they immediately notified Defendants of the hull crack discovered in January 2009, that Defendants attempted to repair the first cracked hull over several months, and that Plaintiffs acted reasonably in believing that the first-discovered hull defect was an anomaly rather than a pervasive structural problem. Plaintiffs' Reply Mem. [Docket No. 109] 6.

Although Defendants repeatedly reference that Plaintiffs received the first yacht in 2007, the hull defects were a difficult-to-discover latent defect specifically contemplated by Minn. Stat. § 336.2-608(1)(a–b) and therefore the reasonable time for revocation begins only when those latent defects are expressed. Id.; see, e.g., Driscoll v. Standard Hardware, 785 N.W.2d 805, 816 (Minn. Ct. App. 2010) ("But warranties are not disclaimed if a product

contains latent defects that cannot be ascertained by a professional buyer examining the product."). Moreover, once Plaintiffs notified Defendants of the hull crack, Defendants took three months to complete the repair. Dayhoff Supp. Decl. [Docket No. 110] Ex. 79; Dayhoff Decl. Ex. 23 at 97:24-98:6. In Minnesota, the analysis of whether the revocation was within a reasonable time does not run while repairs are being performed. See Inland Prods. Corp. v. Donovan, Inc., 62 N.W.2d 211, 219 (Minn. 1954) ("[C]ooperation by the plaintiff in the defendant's attempts to remedy its defaults . . . . should not be charged to the buyer as delay in notifying the seller of the defects."). It was not until the second cracked hull was discovered later in 2009 that Plaintiffs first became aware that this was more than an isolated problem. See Dayhoff Supp. Decl. Ex. 80 at 58:15-19, Ex. 81 at ¶¶ 4, 8. And it was not until additional cracks were discovered in December 2009, bringing the total of cracked hulls to six, that Plaintiffs conducted a thorough investigation of every yacht to determine if hull fracture was an endemic problem. Dayhoff Decl. Ex. 6 at 238:24-240:16; Dayhoff 2d. Decl. Exs. 51–52. Therefore, the reasonableness determination does not begin at Plaintiffs' first acceptance of the first yacht (in 2007) but when the latent defect first became known to Plaintiffs (sometime in 2009). The precise determination of "what constitutes a reasonable time within the context of revocation of acceptance is a jury question that depends on the facts and circumstances of the case." Johannsen v. Minn. Valley Ford Tractor Co., 304 N.W.2d 654, 657 (Minn. 1981). Accordingly, the issue of whether revocation occurred in a reasonable time is also not appropriate for summary judgment.

### E. Defendants' Counterclaims

Defendants allege several counterclaims against Plaintiffs: (1) breach of contract for

failure to remit payment; (2) breach of contract for failure to sell and service; (3) unjust

enrichment; (4) set-off; and (5) recoupment.  Defs.' Answer & Countercl. [Docket No. 56].  To

the extent that any of these counterclaims relate to the four yachts purchased from Windsor

Craft's bankruptcy estate, they are improper.  See Regions Bank v. J.R. Oil Co., 387 F.3d 721,

731–32 (8th Cir. 2004) (finding where a bankruptcy court approved and "found the sale to be

in good faith, for fair value, and in the best interest of [the bankrupt entity] and its creditors . . .

[it is] free and clear of all liens, [and] is a judgment that is good as against the world, not

merely as against parties to the proceedings.").  Defendants delivered the yachts to Windsor

Craft, which later declared bankruptcy.  Therefore, the bankruptcy sale of the four boats to

Windsor Sales was valid, and the principle of res judicata forecloses Defendants from

relitigating claims relating to these yachts.  Therefore, Defendants' counterclaims will be

limited in scope to the five already manufactured yachts which Windsor Sales has refused to

purchase.

   Defendants' counterclaim for breach of contract for failure to remit payment hinges on

whether Defendants first breached the contract and whether Plaintiffs have revoked the

contract.  Because express warranties exist and material factual disputes persist about whether

those warranties have been breached, see supra Section III(C)(2), or the agreement revoked,

see supra Section III(D), Defendants' counterclaim for breach of contract survives summary

judgment.

   Summary judgment is granted on Defendants' counterclaim for breach of contract for

failure to sell and service, because it merely repackages several affirmative defenses.

Consistent with Rule 1, courts should dismiss redundant claims to "secure the just, speedy, and

18

inexpensive determination" of a trial.  Fed. R. Civ. P. 1.  Additionally, Rule 8 states that "If a party mistakenly designates a defense as a counterclaim . . . the court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so." Fed. R. Civ. P. 8(c)(2).  Counterclaims which are "repetitious of issues already before the court via the complaint or affirmative defenses" should be dismissed.  Gratke v. Andersen Windows, Inc., No. 10-CV-963, 2010 WL 5439763, at *2 (D. Minn. Dec. 8, 2010) (internal citations omitted).  Counterclaims that "merely 'repackage' affirmative defenses should also be dismissed," id., because what "is really an answer or defense to a suit does not become an independent piece of litigation because of its label," id. (quoting Tenneco, Inc. v. Saxony Bar & Tube, Inc., 776 F.2d 1375, 1379 (7th Cir. 1985)).  As discussed previously, see supra Section III(C)(2), Plaintiffs' storage, maintenance, and transportation of the yachts are a factor in whether the express warranties have been breached, whether any breach caused the damages, and whether Plaintiffs' damages are reduced by their actions while in possession of the yachts.  Defendants have already asserted these arguments as affirmative defenses, stating that Plaintiffs' claims fail "for unclean hands," for "intervening and superseding cause and for lack of causation," for "failure to mitigate damages," and because "ordinary wear and tear which was assumed by or an obligation of Windsor Yachts."  Defs.' Answer & Countercl. at 10–11, ¶ 4, 10, 16, 17.  Because Defendants' counterclaim for Plaintiffs' failure to service and sell the yachts is already at issue as an affirmative defense and will be resolved at trial, the counterclaim is redundant and summary judgment is therefore warranted.

Defendants' counterclaim for unjust enrichment is without merit and warrants summary judgment.  An unjust enrichment claim requires a showing that "another party knowingly

received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit." Schumacher v. Schumacher, 627 N.W.2d 725, 729 (Minn. App. 2001).  A claim of unjust enrichment does not apply, however, "where the rights of the parties are governed by a valid contract." M.M. Silta, Inc. v. Cleveland Cliffs, Inc., 616 F.3d 872, 880 (8th Cir. 2010) (quoting U.S. Fire Ins. Co. v. Minn. State Zoological Bd., 307 N.W.2d 490, 497 (Minn. 1981)).  As Defendants' counterclaim relates to the four yachts purchased out of bankruptcy, no unjust enrichment survives the application of res judicata.  Defendants have also alleged that Plaintiffs were unjustly enriched by the service they received on the deficient and damaged yachts.  The rights of the parties, however, were governed by a valid contract and Defendants were contractually obligated to render such services.  Because Plaintiffs paid for the yachts, Defendants were required under the contract to make any repairs prior to Plaintiffs' acceptance and to service any yacht issues covered by the express warranty.  Therefore, Defendants' counterclaim does not survive summary judgment.

Finally, Defendants' counterclaims for set-off and recoupment are denied.  Defendants are not entitled to receive payments from Plaintiffs for the four yachts purchased out of bankruptcy for the reasons previously discussed, so the recoupment claims fail.  As for the five yachts manufactured but not yet purchased by Plaintiffs, set-off is not a valid counterclaim for exercising Defendants' rights under the Vicem Agreement.  Set-off is distinguished from recoupment in that it "involves a transaction unrelated to the plaintiff's action." Norwest Bank Minn., N.A. v. Midwestern Mach. Co., 481 N.W.2d 875, 879–80 (Minn. Ct. App. 1992) (quoting Household Finance Corp. v. Pugh, 288 N.W.2d 701, 704 n.5 (Minn. 1980).

Defendants' allegations for set-off all stem from the same contract and transaction at issue in

Plaintiffs' claims – the Vicem Agreement – and therefore set-off is inappropriate.

Accordingly, summary judgment is granted as to Defendants' counterclaims for set-off and

recoupment.

The issues remaining for trial are: (1) whether the express warranty was breached by

Defendants and whether and to what extent that breach caused the alleged damages; (2)

whether the yachts' value was substantially impaired by the breach and whether Plaintiffs

revoked the contract within a reasonable time; and (3) whether Plaintiffs breached the contract

by failing to remit payment for the remaining five yachts.

## IV.  ORDER

Based upon the foregoing, and all of the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that: Plaintiffs' Motion for Summary Judgment [Docket No. 96] is

**DENIED** in part and **GRANTED** in part.

BY THE COURT:


        s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  February 28, 2012.